

# EXPERT WITNESS REPORT

**Imperium Insurance Company**

VS

**Shelton & Associates, P.A., et al**

**July 23, 2015**

**By**

**Ty R Sagalow**



## PRELIMINARY MATTERS

### I

### Witness Qualifications

My CV is attached. In summary, I have been an insurance executive for over 30 years. I have been qualified as an insurance expert under rule 702 by the United States District Court.

From 1987 to 2009, I held various senior positions in AIG including Chief Underwriting Officer and General Counsel of National Union Fire Insurance Company of Pittsburgh Pennsylvania, Chief Operating Officer for AIG eBusiness Risk Solutions and President of AIG Product Development (General Insurance, Global). Following AIG, I was at Zurich, North America and The Tower Group, in each case as the companies' Chief Innovation Officer where I led teams that drafted various policies, among other activities.

As a chief underwriting officer at AIG, I was responsible for major underwriting decisions for one of the world's largest professional liability insurance carriers. As Assistant General Counsel and then General Counsel, I personally wrote, or led a team that wrote, all the insurance policies that National Union produced from 1988 to 2000. These policies included the same, or substantially the same, insurance provisions I have been asked to comment on.

With respect to claims matters, as Chief Underwriting Officer of National Union Fire, I had frequent contact with senior members of the claims department. As a matter of process, both senior underwriters and senior claims personnel worked hand in hand in the creation of any new insurance policy. This occurred in every major new policy. It was the practice of AIG to locate claims physically next to underwriting. Further, I was frequently a participant in major claim meetings. This occurred several times a year for major claims. It also was commonplace for me and the head of claims to discuss coverage positions on potential claims submitted to the company. It would not be uncommon for this type of conversation to occur at least once a week.

1

I graduated *summa cum laude* from Long Island University, *cum laude* from Georgetown University Law Center, and I have an L.L.M. from New York University Law School. I am also a licensed Property & Casualty insurance broker.

In the past four years, I have testified five times as an expert in a deposition and once as an expert at trial. Details of these engagements are included in my CV.

I am the author or co-author of several works in the field of insurance and new product development. Details of these publications are included in my CV.


## II

### Compensation

I am being compensated at a rate of $700 per hour. Days at trial and depositions have a minimum of eight hours. My compensation is not dependent upon my findings or the outcome in this matter.


## III

### Facts and Data Considered

I reviewed and considered the following documentation in reaching my conclusions:

1. The following insurance policy and insurance application:
   a. Policy No. IFI 770968-00, Lawyers Professional Liability Coverage, issued by Imperium Insurance Company to Shelton & Associates for policy period from 2/1/13 to 2/1/14 with a limit of liability of $2m per claim/$2m in aggregate and a deductible of $10,000. (The "Policy").
   b. Insurance application in connection with the Policy signed on January 8, 2013 by Jason L. Shelton.

2. The following pleadings related to the coverage dispute:

2

    a.  Amended Complaint for Declaratory Judgment by Imperium Insurance Company submitted June 3, 2014 ("DJ Coverage Compliant")

3.    The following pleadings relating to the litigation: Livingston v. Shelton ("Underlying Malpractice Claim")

    a.  Second Amended Complaint by Stephen P. Livingston, Trustee for Bankruptcy Estate of Paul Tyler filed on March 12, 2014

4.    The following pleading and other documents relating to the litigation: AFC v Tyler et al ("Initial Lawsuit")

    a.  Amended Complaint dated March 3, 2004

    b.  Circuit Court Final Judgment dated March 21, 2011

    c.  Defendant's Motion to Set Aside Order Granting Summary Judgment and Final Judgment filed March 24, 2011

    d.  [Defendant's] Brief in Support of Motion to Set Aside Order Granting Summary Judgment and Final Judgment

    e.  [Plaintiff's] Response to Defendant's Motion to Set Aside Order Granting Summary Judgment and Final Judgment

    f.  Rebuttal to Plaintiff's Response to Defendant's Motion For Leave to Amend submitted December 29, 2011

    g.  Defendant's Motion For Leave to Amend Plaintiff's Requests for Admissions

    h.  Order and Opinion Denying Defendant's Motion to Leave to Amend Plaintiff's Requests for Admissions dated January 31, 2012

    i.  Defendant Notice of Appeal dated February 29, 2012

    j.  Brief of Appellant (Tyler) dated September 6, 2012

    k.  Brief of Appelle (AFC) dated November 7, 2012.

    l.  Supreme Court Decision dated April 4, 2013

    m.  Appellant's Motion for Rehearing dated April 25, 2013

      n.  Response by Appellee (AFC) to Appellant (Tyler) Motion for Rehearing dated May 2, 2013

      o.  Supreme Court Decision on Motion for Rehearing dated June 13, 2013

5. The following depositions:

      a.  Evynn Grover

      b.  Tony Fornaro

      c.  Jason Shelton

      d.  Gaywn Mitchell

      e.  Christopher Bauer

      f.  Paul Tyler

      g.  Jonathan Crump

      h.  Howard Fishbein

6. Various correspondences within or between the parties or their representatives and/or other documents relevant to this matter including those documents found in:

      a.  attachments to one or more of the pleadings or depositions stated in 2-5 above, specifically including, in part (with partial repetition to those documents stated above):

           i.  Amended DJ Complaint

          ii.  Policy

         iii.  Application

         iv.  January 24, 2013 letter from Jason Shelton to First Indemnity

          v.  Complaint, Amended and Second Amended Complaints (Underlying Malpractice Claim)

         vi.  Request for Admissions (AFC v Tyler)

        vii.  Order and Final Judgment (AFC v Tyler

      viii.  Supreme Court Decision (AFC v. Tyler)

         ix.  York Pro Reservation of Rights letters dated May 1, 2014

4

7.    Plaintiff Expert Witness Report of W.C. Trotter.

IV

Questions Presented and Summary of Opinion

I have been asked to comment on the custom and practice in the insurance industry with respect to the common understanding of the scope of coverage provided by certain provisions of a Lawyer's Liability insurance policy.  In particular, I have been asked to examine certain coverage parts provided in the insurance policy issued to Shelton & Associates ("Named Insured") effective February 1, 2013 from Imperium Insurance Company ("Imperium") (the "Policy"), and related application signed by Jason L. Shelton on January 8, 2013 and supplemental "warranty letter" dated January 23, 2013 (together the "Application") and to provide testimony regarding industry custom and practice with respect to such Policy, in particular with respect to the meaning and application of the Exclusion II.B. ("Known Wrongful Act" exclusion) and related "Application Representations – Signatory" provision appearing as Conditions XV[1].  Both of these provisions may be referred to me, in combination, as the Known Wrongful Act Provisions.

I was also asked to comment on the expert report done by Plaintiff's expert W.C. Trotter with regards to the above matters.

As more fully discussed in this report, it is my expert opinion that neither the Known Wrongful Act Exclusion nor the Applications Representations condition serve to exclude coverage for the Underlying Malpractice Claim, and the Policy should provide coverage to the Underlying Malpractice Claim, subject to its limit of liability and deductible.

---

[1] The DJ Coverage Compliant contains four other references in the Policy: Related Wrongful Acts (Section V.B.C), Retroactive Dates, the Claims Made nature of the Policy and the Other Insurance Clause (see DJ Coverage Compliant, pages 13-14).  However, as far as I know, there has been no actual allegation by Imperium of a Related Wrongful Act, a Retroactive Date issue as far as defendants Shelton and Daniels are concerned, any disagreement that the Amended Complaint in the Underlying Malpractice Claim filed after the expiration date of the policy is not, by operation of the Related Wrongful Act provision, deemed to be made to the Complaint filed within the policy period, or that there is in fact any Other Insurance that might be applicable to this claim.  I reserve my rights to further amend this report if such allegations are ever made by Imperium.

5

I have not been requested, and do not offer an opinion, as to whether any insured under the Policy, including Jason L. Shelton, in fact committed legal malpractice with respect to the allegations contained in AFC vs. Tyler et al (the "Initial Lawsuit"). The only question I am providing an opinion on is whether any insured under the Policy, including Jason L. Shelton, in fact knew, or could have reasonably foreseen, **on January 8 and January 23nd, 2013** that an insured under the Policy committed a Wrongful Act that might be expected to be the basis of a Claim as that term is defined in the Policy.

With respect to this question, as further analyzed in this report, my expert opinions are:

1. The chief purpose of a known wrongful act provision, whether inserted into the Exclusion section of a policy or in the Conditions section is to assure the insurance company that they do not have to cover a claim made during the policy period if, <u>as of the date of the application for insurance</u>, an insured had reason to know a claim would be made.

2. Thus the "known wrongful act" exclusion is, from an industry custom and practice point of view, supposed to work "hand in hand" with the known wrongful act/prior knowledge questions of the application and the concept that an insured may not make a misrepresentation in connection with the purchase of insurance and expect to have a claim which arises from that misrepresentation be covered.

3. The only relevant dates to which the Insured's knowledge of potential Wrongful Acts should be reviewed are the date of the insurance application and warranty statement executed in connection with the purchase of insurance, to wit in the case in dispute: January 8, 2013 and January 23, 2013.

4. Information received or court decisions made after the date of application for insurance, including the Supreme Court decision of April 4, 2013, cannot be used as a

6

basis for denying coverage based on the Known Wrongful Act Provisions.

5.   Knowledge of a possible Wrongful Act by a person who is <u>not</u> an insured does not trigger the Known Wrongful Act Provisions.

6.   Knowledge of a possible Wrongful Act occurring prior to the date the insured attorney was retained on this case does not trigger Known Wrongful Act Provisions.

7.   The Known Wrongful Act exclusion is severable, meaning that the knowledge of each insured must be viewed separately and independently from any other insured.  For the purposes of this exclusion, the knowledge of one insured shall be imputed to any other insured.

8.   For the Known Wrongful Act Provisions of the Policy to apply, knowledge must be viewed from both a subjective test (what the individual actually thought) as well as an objective test (such thoughts must not be unreasonable).   These tests must be applied on January 8 and January 23nd, 2013 and no other date.

9.   There is no doubt (nor do I think it is argued by the plaintiff) that any Insured *subjectively* ever thought that a claim would be brought by their client, Paul Tyler (directly or indirectly) on the relevant dates in question.

10. From an objective point of view, it was not until April 4, 2013, or perhaps even later, months after the insurance application and warranty statement has been completed and sent to the carrier, and months after the inception date of the Policy, that an Insured might have anticipated that a claim for malpractice might be commenced sometime in the future. (Indeed, no such complaint was in fact filed until the following year.)

7

11. Accordingly, neither of the Known Wrongful Act Provisions apply to the facts of this case.

My work in this matter is ongoing, and I reserve my rights to modify, amend, restrict or otherwise revise this opinion if I become aware of facts or considerations that require such a revision, including without limitation, opinions offered by me or opinions or statements offered by others in deposition or at trial.

## DETAILED DISCUSSION

### V

### SUMMARY OF UNDERLYING FACTS

1. In March of 2004 AFC sued Tyler in Bankruptcy Court arising out of a 1999 sales transaction gone wrong for a used car finance company between Tyler (as buyer) and Jim Earl Aron (as seller and sole shareholder of AFC). Tyler hired an attorney named William Griffin ("Griffin") who at the time was employed by the Named Insured.

2. In May of 2004, Griffin leaves the Named Insured.

3. On April 30, 2004, Tyler informs the Named Insured that he is going with Griffin and as of April 30, 2004..[2]

4. Apparently nothing much goes on with the case for a couple of years until February 14, 2006 when the case is moved to the Circuit Court for Calhoun County, Mississippi.

---

[2] See Tyler Deposition on page 20, lines 8-25, and accompanying letter in appendix to deposition.

8

5. On April 19, 2006, about two months after the case was transferred, AFC serves Griffin with a Request for Production of Documents but apparently sends the notice to Griffin's old address at the Named Insured. The Named Insured advises AFC that Griffin left the firm two years earlier and gives AFC Griffin's new address.

6. On May 24, 2007, a little over a year later, AFC serves Griffin at his "new address" a Request for Admissions. It is unclear whether Griffin ever received this document since the request was apparently sent to the wrong zip code.

7. Under Mississippi law (Rule 36), Admissions are deemed admitted if they are not responded within thirty days. As of June 24, 2007, Griffin has never responded. (Indeed, he apparently never responded). Rule 36 is self-executing.

8. On July 9, 2007 and then again on August 7, 2009, AFC files a Motion to Hold Admissions Admitted arising out of Griffin's failure to respond. (Even though Rule 36 is technically self-executing and no motion is necessary.)

9. On October 29, 2007, Paul Tyler rehires the Named Insured indicating that he believed Griffin "seemed to quit focusing on my case"[3]. Jonathan Crump of the Named Insured advises the court of the change in attorney on October 30, 2007, the next day, referring to the upcoming Motion to Hold Admissions Admitted.

10. On February 8, 2008, the court hears AFC's Motion to Hold Admissions Admitted and rules in favor of AFC.

11. On March 11, 2011, the court hears AFC's Motion for Summary Judgment. Issues in dispute are the defendant's lack of response to plaintiff's Request for Admissions (and resulting 2008 decision to hold such admissions as being Admitted). Defendant was

---

[3] Tyler Deposition, page 65, lines 21-22

not represented at this hearing and the court held in favor of plaintiff AFC.

12. Over the next several years, there are various motions and ultimately appeals arising out of Giffin's failure to respond to AFC's May 24, 2007 Request for Admission on a timely basis pursuant to local rule 36, as well as defendant's allegations that prior pleadings and motions were not sent to the correct address for defendant's attorney or was sent to the wrong attorney. Finally, on or about June 13, 2013[4], approximately six months *after* the Named Insured submitted its application for insurance in this matter[5], the Supreme Court gives its final ruling denying Tyler's motion for rehearing and setting the lack of a response to the Request for Admissions in stone. This also sets in stone the motion for summary judgment which was decided based solely on the "admitted admissions". The Supreme Court held that the circuit court was correct in its decisions arising out of the Request for Admissions and that the excuse that the prior pleadings and/or motions were not sent to the correct attorney address, even if true, was simply irrelevant.

13. The above facts are, to the best of my knowledge, not in dispute by either party.

## VI

## THE BACKGROUND AND UNDERWRITING INTENT OF THE KNOWN WRONGFUL ACT EXCLUSION (AND RELATED "CONDITIONS" PROVISION AND APPLICATION REPRESENTATIONS) IS TO ASCERTAIN KNOWLEDGE OF THE INSURED ON THE DATE OF THE APPLICATION FOR INSURANCE

12. Before discussing the actual terms of the Policy and the application, it is important to review the underwriting reason behind the "known wrongful act exclusion" and the

---

[4] The Supreme Court's initial decision in favor of AFC was on April 4, 2013, a little less than three months *after* the Named Insured's application for insurance for this Policy.

[5] The application for insurance for the Policy was signed by Mr. Shelton on January 8, 2013. Subsequently, on January 23, 2013, Mr. Shelton also completed a updated warranty statement indicating that he knew of no circumstance that could rise to claim (other than those disclosed in the January 8th application).

10

representation statements made in an application for insurance.

13. It is fundamental to insurance that an insurance company has the right to ask questions that it deems relevant to its decision whether to underwrite the risk. These questions must be answered honestly and truthfully from the point of view of the applicant.

14. This fundamental underwriting goal can be achieved in several ways during the underwriting process. One, underwriters can and frequently do meet with applicants, or speak to them on the phone, to gather facts on the risk. This is especially important with new applicants, like Shelton & Associates, as the carrier does not have a direct history with the risk upon which they can rely.

15. Sometimes, however, an insurance carrier will choose not to spend the time with insurance applicant to learn more about the risk before making a decision whether to provide coverage. While this is understandable when it comes to smaller applicants (and, more importantly, the smaller premiums that they represent), the decision comes with additional risk to the underwriter. Because the underwriter who chooses this path has no ability to ask follow up questions or interact with the applicant in any meaningful way, their knowledge of the risk is limited and they are forced to rely upon answers to written, and therefore more narrowly framed, application questions.

16. Chief among these questions are the representations or "warranty" questions on an application for insurance. These typically ask whether there was any past claims and/or whether any insured has knowledge of an "act, error or omission" that could reasonably be anticipated to give rise to a claim.

17. As long as the applicant answers these questions honestly, the underwriter cannot later deny coverage based on alleged misrepresentations in the application, nor generally

11

apply a known wrongful act exclusion.

18. Finally, it is worth noting in this general section that it is black letter law (as well as black letter custom) that exclusions are to be narrowly construed. And, further, when multiple reasonable meanings can apply to an exclusion, the exclusion is to be construed in a manner that most favorable to coverage. From a custom and practice point of view, this rule generally applies regardless of whether the known wrongful act exclusion is in the exclusion section or the Conditions clause.

VII

AS OF JANUARY 2013, NEITHER DEFENDANT SHELTON NOR DEFENDANT DANIELS BELIEVED THAT THERE EXISTED A WRONGFUL ACT BY A MEMBER OF THE SHELTON FIRM THE KNOWN WRONGFUL ACT THAT MIGHT GIVE RISE OF A A CLAIM.

19. Like most lawyer's professional liability policies, the Imperium Policy contains what is popularly known as a "known wrongful act exclusion" in Exclusion II.B. That exclusion reads:

> This policy does not apply to... any CLAIM arising out of any WRONGFUL ACT occurring prior the effective date of this policy if:
>
> B.    if [sic] the INSURED at or before the effective date knew or could have reasonable foreseen that such WRONGFUL ACT might be expected to be the basis of a CLAIM. However, this paragraph B. does not apply to any INSURED who had no knowledge of or could not have reasonably forseen that any such WRONGFUL ACT might be expected to be the basis of a CLAIM.

20. Before looking at the four main features of this Known Wrongful Act exclusion, it is important to note that despite the seemingly broad phrase "at or before" the effective date, it is not the custom or practice of the industry to look at all the knowledge of all

12

the insureds from the beginning of the world to the effective date of the policy. Nor, despite the word "a" before "claim", is it the intention of this language to apply to *any* claim that might be made against the insured but rather to *the* claim that is actually made against the insured. In essence, as discussed in the prior section of this memorandum, the known wrongful act exclusion is intended to dovetail with application warranty questions and the notion that Insureds may not make a misrepresentation in connection with the purchase of insurance and expect claims arising out of that misrepresentation to be covered.

21. And, of course, such knowledge must be *before* the effective date of coverage so any knowledge (actual or implied) that occurs *after* the effective date of coverage doesn't count.

22. Accordingly, in the case of Imperium, the known wrongful act exclusion is evaluated based on the knowledge of the insured at the time of the application for insurance, January 8 and January 23, 2013, and not at any time before or after such dates.

23. Question 30 b. of the insurance application signed on January 8, 2013 states:

After inquiry, are any attorneys in your firm aware ... of any legal work or incidents that might reasonably be expected to lead to a claim or suit against them?

24. Jason Shelton answered in the negative to the question.

25. Similarly, on January 24, 2013, Jason Shelton sent a letter to First Indemnity (the insurance broker for the Policy) stating that:

This is to acknowledge that, after inquiry, I am not aware of any claims, or circumstance, disciplinary matters, investigations, acts, errors or omissions that may result in a professional liability claim since completion of my application dated January

13

10[6], 2013.

26. Our inquiry is whether these answers were the correct ones.  For the reasons I set forth below, I believe that they were.

27. I do not believe any party doubts that neither Jason Shelton nor Amanda Daniels *subjectively* believed in January of 2013, or even as of today, that the law firm or they personally would be sued for malpractice. In the words of Mr. Shelton in response to this question in his deposition, he states:

> "[O]n January, I think it was, 8th – January 8th of 2013, I did not have any reason to believe that a suit would be filed, you know, on this matter.  And, you know, as we sit here today … I don't – I still don't understand how we are getting sued on the --- on the case…I don't understand it now.  You know, you are talking about something that I think is entirely unforeseeable.  And even now, let's say a year into the litigation or more, I don't understand how it's continuing."[7]

And in response to the follow-up question "Can you tell me the basis for that opinion that you just expressed?", Mr. Shelton explains:

> "Well, you're talking about … a case on behalf of … Mr. Livingston, filing what appears to be some sort of assignment of a claim, my understanding without the consent or authority of our client [Mr. Tyler][8] *on behalf of actions that took place while Mr. Tyler was not our client by someone who was not an employee of our firm.*  Now, how we get sued for that is still a mystery to me."[9] (emphasis added)

---

[6] The copies of the application I have reviewed has a date of January 8, 2013, not January 10th,  but I have no reason to believe that this letter is referring to any other application.

[7] Deposition of Jason Shelton, page 100, lines 2-8

[8] Similarly, Ms. Daniels comments in her deposition that "it never occurred to Mr. Tyler [that a trustee in bankruptcy could sue his law firm without his consent]. I know that" (page 63)

[9] Deposition of Jason Shelton, page 100 at lines 11-19

14

28. Similarly, Ms. Daniel expresses the same conclusion in her deposition when she stated (in response to hearing about the $2.9 million judgment against Mr. Tyler):

> "Well, anytime a 2.9 million dollar judgment is entered against anybody I think there's concern about it. Honestly, though, when I looked at the court file and saw these pleadings were not being sent to the Shelton office all these years, I wasn't terribly concerned at the time…"[10]

And later in her deposition, she spoke about the process Mr. Shelton uses in connection with the lawyer's professional liability application and her involvement in such process on the January 2013 application[11]:

> Q- Did he ever consult with you regarding whether there was any potential claim or circumstance that could lead to a malpractice claim?
>
> A- Yes
>
> Q- He did that in the application process?
>
> A- Yes, It was standard every year at the law firm. When it was time for him to renew the malpractice insurance, he would contact every attorney in the firm and ask if we knew about any potential claims?

The attorney for the Plaintiff further questions Ms. Daniels on the issue of why she was not aware of a potential malpractice claim arising out of the Tyler matter focusing on a conversation she allegedly had with the Tyler bankruptcy attorney, Mr. Gawyn Mitchell , about a conversation Mr. Mitchell allegedly had with Mr. Dambrino during which Mr. Dambrino talked about potentially bringing a malpractice action against the insureds. Part of that exchange was:

> Q- Did you disclose to him what you had heard about Mr. Dambrino's threats about a legal malpractice action?

---

[10] Deposition of Amanda Todd Daniels, page 40
[11] *Ibid* at page 59

15

A-    No, I didn't

Q-    Okay. But as of the time of this application, February 1, 2013[12], you were aware of the threats by Mr. Dambrino, weren't you?

A-    I don't remember the exact dates. I mean, you're trying to nail me down on a date. I mean, I remember Gawyn Mitchell telling me this. I can't tell you what date he told him.

Ms. Daniel later testifies that she doesn't know whether it was in "January 2013, February 2013, March 2013, April, May or June of 2013"[13] that she had the conversation with Mr. Mitchell about Mr. Dambrino possibly bringing a malpractice action. According to Mr. Mitchell's deposition, it would "more likely that it [the conversation between him and Mr. Dambrino] might have been April" of 2013[14], a date well after the date of the Policy Application.

29. Accordingly, the real question for our inquiry is not what Mr. Shelton and Ms. Daniels believed but whether the good faith belief held by both Mr. Shelton and Ms. Daniels[15] was unreasonable. For the reasons discussed in the next section, the answer is that it was not unreasonable.


## VIII

## THE GOOD FAITH HELD BELIEF BY DEFENDANT SHELTON AND DANIELS THAT THERE WAS NO WRONGFUL ACT THAT MIGHT GIVE RISE TO A CLAIM WAS NOT UNREASONABLE

---

[12] That was actually the date of inception for the policy. The application date was January 8, 2013.
[13] Deposition of Amanda Todd Daniels at page 77
[14] Deposition of Gaywin Mitchell, page 48, line 12-16
[15] Because of the retroactive date issue, this report does not discuss defendants Christopher Bauer and Jonathan Crump on this issue. However, I say in passing, that based on their depositions neither of these gentlemen anticipated any claim or suit.

30. Exclusion II B. being an exclusion, the burden is on the insurance company to show its applicability. The burden is also on the carrier to show that there was a misrepresentation in connection with the purchase of insurance.

31. Accordingly, the carrier must show that on January 8th and/or January 23nd, 2013, it would have been *unreasonable* for Jason Shelton and/or Amanda Daniels (bearing in mind the severability element of at least the exclusion) to believe that there was no Wrongful Act of an insured that might give rise to a claim.

32. As mentioned above, it is my professional opinion that Imperium cannot show this. Put another way, the good faith subjective belief of the defendants that they would be not sued was not an unreasonable one on their part given what they knew in January of 2013.

33. It is often said that "Bad Facts Make Bad Law". In my experience, it is also true that "Bad Facts (can) Make Bad Coverage Decisions". Such seems to be case here with Imperium's decision here.

34. The DJ Coverage Action relies heavily on the final June 2013 Supreme Court decision holding against Mr. Tyler. A part of that decision that the DJ Coverage Actions quotes are the paragraphs talking about the January 30, 2008 hearing on AFC's motion to have the request deemed admitted (the motion shortly after the Named Insured took back the case from Mr. Griffin) wherein, according to the court transcript, Mr. Bauer as a representative of the Shelton firm said that he had "no response" to AFC's motion. Not surprisingly, the Reservation of Right letter issued on May 1, 2014 (some 11 months after the June 2013 decision) by York Pro on behalf of Imperium quotes the same paragraph. Indeed, this reference is seemingly the ONLY fact that the Reservations of Rights letter refers to. The DJ Coverage action also argues that the March 2011 Summary Judgment hearing at which the Named Insured did not appear or respond is a

basis for a finding of no coverage.

35. If one reads the Supreme Court decision, it seems clear to an objective observer that someone in the Shelton firm did something wrong. The issue that was most clarifying (and indeed a bit surprising, at least to me) was that the court dispensed with the insured's main argument that the Shelton firm never received the plaintiff's 2011 motion for summary judgment and therefore cannot be faulted for not responding to it. Yet, this argument did not carry the day with the Mississippi Supreme Court. Before the point of the Supreme Court's decision in June of 2013, I can certainly see how Mr. Shelton and Ms. Daniels, based on their testimony, would have held the reasonable belief that AFC's failure to serve the firm with the 2011 motion, at least, should have prevented a decision favorable to AFC on appeal. However, as mentioned many times earlier in the report, Imperium, nor any other insurer, can apply a Known Wrongful Act provision the basis of a court decision that was made AFTER the date of the insurance application.

36. In all events, however, our inquiry today is NOT "Did Jason Shelton and/or Amanda Daniels commit malpractice?" Indeed, it is not even whether their good faith belief that they did not was unreasonable as of June 2013 after the Supreme Court decision referenced in the immediately preceding paragraph came down, or any subsequent date. Rather our analysis must focus on the facts as they were known in January of 2013.

37. The testimony of Mr. Shelton quoted earlier in this report indicates why he held the belief he did. In addition to his consistent argument that he did not receive notice of the 2011 Motion for Summary Judgement, Mr. Shelton lists three other reasons for the unforeseeability of the claim brought by Mr. Livingston as bankruptcy trustee of Mr. Tyler:

    a. Someone other than his client (Mr. Tyler was suing as an assignee of Mr. Taylor without Mr. Tyler's consent,

18

    b. The lawsuit arises out of an action that took place *before* the Shelton firm was retained, and

    c. The alleged action was taken by an attorney who was *not* an employee of the firm when the action was taken.

38. The testimony of Ms. Daniels is similar except it concentrates on the lack of notice fact. According to her testimony and others representing the Named Insured, all the papers that allegedly was sent to the Named Insured was in fact sent to the wrong address or the wrong attorney so the Named Insured was not aware of any of these papers or their contents.

39. My initial analysis will focus primarily on the last two facts mentioned by Mr. Shelton.

40. It seems undisputed by the parties that:

    a. The alleged malpractice that led to the $2.9 million judgment against Mr. Tyler was the alleged failure of Mr. Griffin to respond to Plaintiff's Request for Admissions within the thirty day period provided by local rule 36, *coupled* with the failure of the Named Insured to respond to or defend the 2011 motion for summary judgment. (Of which the Named Insured contents he never received notice of, an argument that the Supreme Court found in June of 2013 to be irrelevant.)

    b. William Griffin was Mr. Tyler's attorney on May 24, 2007 when the Request for Admissions was served. (Whether to Mr. Griffiin's correct, or it seems, incorrect address.)

    c. William Griffin was Mr. Tyler's attorney on June 24, 2007 when the thirty day period to respond to the Request for Admissions expired.

19

    d.   The Named Insured was not the lawyer or the law firm for Mr. Tyler on May 24, 2007 or on June 24, 2007; indeed, did not become the attorney again until October 29, 2007, long past the time to respond to the Request for Admissions had expired.

    e.   Rule 36 is "self-executing". That is to say, once the 30 days lapse, the Admissions are deemed Admitted.

    f.   The $2.9 million judgment was a nature consequence of having the plaintiff's request for admissions deemed admitted.

41. In my view, custom and practice analysis of the reasonableness of Mr. Shelton's and Ms. Daniel's conclusion that they had not committed any malpractice should end there. The alleged errors were two fold: (1) The Named Insured not responding to the Request for Admissions on a timely basis and (2) the failure of the Named Insured to respond to the 2011 Motion for Summary Judgment.

42. As to the first, it was the Named Insured's good faith and objectively reasonable belief (and seemingly true) that it was *Mr. Griffin* who did not respond to the Request for Admissions. Whether this error was a result of not mailing the request to the right address, Mr. Tyler refusing to cooperate with answering the requests or simply Mr. Griffin forgot about them is not relevant to the coverage issue at hand. The only relevant fact is that any action or inaction was by Mr. Griffin who was not an employee of the Named Insured on the relevant dates.

43. As to the second prong as well as the references to the DJ Coverage Complaint and the Reservation of Rights letter to use the actions by the Named Insured during the February 8, 2008 hearing as a foundation for knowledge of a Wrongful Act that might result in a Claim, my analysis as to those events consistent with custom and practice in

20

the industry is as follows.

44. With respect to the 2008 hearing, according to the testimony of Christopher Bauer, the only chance of saving the day at the hearing of February 8, 2008 would be to have his client, Mr. Tyler testify on the stand and deny those acts which are stated in the Request for Admissions. The reason for this is, again, the self-executing aspect of rule 36. However, Mr. Bauer believed that despite this feature of rule 36, he *might* be able to get the court to not grant the motion *but only* if his client showed up.  In the words of Mr. Bauer speaking about the day before the motion was to be heard[16]:

> "I read them [the Request for Admissions] briefly and immediately started trying to get Mr. Tyler on the telephone. It was late afternoon, if not after hours, when I finally spoke with Mr. Tyler.  He and I spoke for about an hour-and-a-half."[17]

> "Well, first off, my position on admission was and remains that once those times [to respond to the Request for Admissions] have passed, there's no need for a motion to have them deemed admitted.  That was the position I took over the telephone with Mr. Tyler.  And I explained to him that, look, this is something that has happened procedurally, I'm going to do my best to get you in front of the judge, get you to talk about these things.   He never committed to be willing to come to the hearing. He said I might be there. And that was at the close of our conversation."[18]

> "My message to him was, my request of him was, let me put you on the stand, get you sworn in, and you explain to the judge why these admissions should be denied.  And this is an opportunity they've given us to be heard by the judge, one last chance."[19]

---

[16] Mr. Bauer also testified that he just got the file that day so this was the first time he could try to call Mr. Tyler.
[17] Deposition of Christopher Bauer, page 10, lines 11-15
[18] Deposition of Christopher Bauer, page 12 line 23 thur page 13 line12.
[19] Deposition of Christopher Bauer, page 13 line 15-20

21

45. And, as we know, Mr. Tyler did not in fact appear.

46. Objectively speaking, this puts Mr. Bauer's "no response, your honor" in a whole new light. A light that might reasonably lead Mr. Shelton to believe that nothing happened at the February 8, 2008 hearing that would represent a "Wrongful Act that might be expected to be the basis of a Claim".

47. Finally, with respects to the events of the March 11, 2011 and the Named Insured's failure to respond because, at least according to the insureds, they never received notice of the hearing, my analysis of that event from a custom and practice of the insurance industry looking at a "known wrongful act" provision is as follows.

48. There is some disagreement between the parties as to what exactly happened..

49. For the purposes of this report, I will view the facts as they are described by Ms. Daniels since without a conclusion by the trier of fact, industry custom compels that an insurance carrier must look at disputed facts in the manner most favorable to the insured and most favorable to coverage.

50. As discussed earlier, according to the testimony of Ms. Daniels and Mr. Shelton, the firm was unaware that there was a motion on the Tyler case scheduled for that day, March 11, 2011. Both parties agree that Mr. Dambrino found Ms. Daniels in the courtroom as she was there on another case. What happened next is somewhat in debate. The plaintiff believes that Ms. Daniels was told that her firm was representing Mr. Tyler and that her firm received the notice of the hearing as well as the motion for summary judgment itself. Ms. Daniels testified, however, that opposing counsel told her that he thought the Shelton firm was in fact not the attorney for Mr. Tyler but that they may have simply neglected to official withdraw as attorney of record.[20] Further,

---

[20] Deposition of Amanda Todd Daniels, page 34.

22

Ms. Daniels testified that she confirmed this suspicion with a call into her office and spoke to the attorney, Brandon Leslie, who had taken over Mr. Crump's files.[21] It was for this reason, she felt it was okay to leave the courtroom.

51. As it turned out, as we now know, the Shelton firm was representing Mr. Tyler at the time of the March 11, 2011 hearing. However, the insureds maintain with strong conviction that the notice and/or motion scheduled for that day was, as was the case in their view with prior notices and motions, mailed to the incorrect address and/or the wrong attorney (e.g. Mr. Crump at his new (post Shelton firm) address).

52. For the purposes of determining the application of the Known Wrongful Act Provisions at the stage of declaratory judgment, i.e. before any factual finding or good faith investigation by the carrier, custom of the insurance industry dictates the carrier must, at least temporarily, assume the facts as stated by the insured.

53. Accordingly, based on the facts as stated by the Insured it was reasonable for Ms. Daniels to leave the courtroom on March 11, 2011 when she did. Even if the facts turn out otherwise and the facts end up being what Mr. Dambrino alleges, this does not compel a different result for the applicability of the Known Wrongful Acts Provisions as it is the good faith recollection of Ms. Daniels as she remembered in January 2013 a not recorded conversation of almost 3 years earlier that is relevant.

54. I note that the testimony of both Ms. Daniels and Mr. Shelton is that Mr. Tyler gave no indication, even up today, that he would himself file or be in favor of filing a malpractice claim against them or the firm. Certainly, this was the case in January 2013 according to their testimony. This fact is a favorable factor toward the reasonableness of their view that they would not be sued.

---

[21] *Ibid*

23

55. Finally I note that according to the testimony of the bankruptcy lawyer for Mr Tyler, Gawyn Mitchell, consistent with the testimony of Ms. Daniels, the estate of Mr Tyler was first advised of a possible malpractice action against the Named Insured by Mr. Dambrino in April of 2013 after the Supreme Court made its decision, and after the date of the Policy's Application.[22]

56. In conclusion, from both a subjective and objective point of view, neither Mr. Shelton or Ms. Daniels was aware, in January of 2013, of a Wrongful Act that might be expected to be the basis of a claim a year later.


IX

THERE IS NOTHING IN MR. TROTTER'S REPORT, EXPERT FOR THE PLAINTIFF, THAT CHANGES MY OPINIONS AS SET FORTH ABOVE

57. Like the DJ Coverage Complaint and the Reservation of Rights letter, Mr. Trotter's report refers to almost no facts to support his conclusion that "Shelton, with the knowledge that he had of this actions representing Tyler, could have reasonably foreseen that his actions might be expected to be the basis of a claim against him by the client through the Bankruptcy Trustee".[23]

58. Mr. Trotter's report refers to only 3 "facts" to support his conclusion:
    a. Shelton failed to respond to "dispositive motions" against Tyler;
    b. Such actions or inactions resulted in a adverse judgment of $2.9 million;
    c. According to the Supreme Court decision, Shelton also missed the opportunity to raise "all the arguments made on appeal" at a earlier time;

---

[22]. Deposition of Gawyn Mitchell, page 48, lines 12-16
[23] Expert Report of W.C. Trooter, page 10.

24

59. These "facts" can be easily analyzed:

    a. The "dispositive motions" are presumably the 2008 and 2011 motions discussed at length above to which this report concluded did not represents Wrongful Acts which the insureds would reasonable believe, as of January 2013, would be the basis of a claim;

    b. The insureds reasonably believed that these "dispositive motions" actions were NOT the acts that led to the $2.9 million judgment but rather, as discussed in this report, it was *Mr. Griffin's alleged failure to reply* to the Request of Admissions within the time frame provided by rule 36 that lead to the adverse judgment;

    c. Anything in the Supreme Court decision, and certainly its conclusions about what arguments could have been made when and by whom, cannot be relevant to our analysis as that decision was made after the date the application for insurance for the Policy was made.

60. Finally, Mr. Trotter makes a "Hail Mary" attempt to bring in the Supreme Court decision in even knowing that it took place after the date of the application by arguing that Mr Shelton had the benefit of the briefs on with which the Supreme Court decision ended up agreeing. The reason why this argument does not work is that if Shelton and Daniels reasonably believed what they did, the fact that the opposing side believed something else and thus put it in their appellate papers does not suddenly become "knowledge" of a Wrongful Act that might reasonably be the basis of a future claim.

X

Conclusion

For the reasons set forth above it is my professional opinion that, based on the custom and practice of the insurance industry as well as the history, intent and actual wording of the

Known Wrongful Acts Provisions, these provisions do not apply to the Underlying Malpractice Claim and that accordingly coverage for such claim should be provided by Imperium.


Sincerely,


Ty R. Sagalow